2026 Tex. Bus. 22



THE BUSINESS COURT OF TEXAS
EIGHTH DIVISION

| | | |
|---|---|---|
| THE MARK AT WEATHERFORD OWNER, LLC, | § § § § § § § | |
| *Plaintiff*, | | |
| v. | § § § | Cause No. 25-BC08B-0025 |
| DARWIN GERMAN, INDIVIDUALLY, and DARCORP MANAGEMENT GROUP, INC. d/b/a DARWIN GERMAN REAL ESTATE, | § § § § § § § | |
| *Defendants.* | § | |

---

**MEMORANDUM OPINION AND ORDER GRANTING PLAINTIFF'S TRADITIONAL MOTION FOR SUMMARY JUDGMENT**

---

### INTRODUCTION

¶ 1.    This case is about a real estate deal that closed on paper but stalled in practice. In December 2022, Plaintiff The Mark at Weatherford Owner, LLC ("Plaintiff") agreed to sell a multimillion-dollar apartment complex to Defendants. When Defendants struggled to assemble the required cash, Plaintiff stepped in to

salvage the deal by extending $4.7 million in seller credit—accepting membership units in the buying entity as collateral, on the shared understanding that it would be repaid in full within months.

¶ 2.    Plaintiff did not take that promise on faith alone. As a condition of the arrangement, it negotiated a "Put Right." If certain "Automatic Triggers" occurred—including any contractual default by Defendants—Plaintiff could demand that Defendants immediately repurchase the membership interest for cash.

¶ 3.    More than three years later, Plaintiff remains unpaid and the parties are deadlocked over whether any Automatic Trigger was activated. Most of the dispute turns on a single word: "payable." Plaintiff contends that the parties' agreements required Defendants to turn over certain fees that were "payable" to Defendants at the closing of the property sale—fees that became due at closing regardless of whether sufficient cash was on hand to satisfy them. Defendants' failure to remit those funds, Plaintiff argues, constituted a contractual default that triggered the Put Right. Defendants disagree. In their view, the fees were not truly "payable" because there were insufficient funds to pay them at closing. The Court rejects that reasoning. A contractual obligation does not evaporate simply because the obligor lacks liquidity. The fees were due and payable at closing, and Defendants' failure to remit them triggered the Put Right.

¶ 4.    Finding no genuine dispute of material fact, the Court **GRANTS** Plaintiff's Traditional Motion for Summary Judgment.

## BACKGROUND FACTS

**A.    The Transaction.**

¶ 5.    Plaintiff owned a residential apartment complex in Weatherford, Texas (the "Property").[1] In December 2022, Plaintiff agreed to sell the Property to Defendants Darwin German ("German") and Darcorp Management Group, Inc. ("Darcorp") for approximately $76.75 million.[2]

¶ 6.    As closing approached, the deal encountered difficulty. The parties amended their agreement multiple times—first reducing the purchase price to $70 million,[3] then restructuring the consideration to include both cash and seller equity.[4] Even so, Defendants struggled to raise the needed capital. Shortly before closing, Defendants advised Plaintiff that additional seller participation would be required for the transaction to proceed.[5]

¶ 7.    Plaintiff faced a choice: walk away or restructure the economics to save the deal. Plaintiff chose to proceed, agreeing to increase its seller financing from $3.5 million to $4.7 million.[6] In substance, this financing functioned as a short-term

---

[1] Munster Decl. ¶ 3.
[2] *Id.* ¶ 5.
[3] *Id.*
[4] *Id.* ¶ 8; Pl.'s Ex. 1-B (Fourth Amendment to Purchase and Sale Agreement) § 2 (App. 82).
[5] Munster Decl. ¶ 9.
[6] *Id.*

bridge loan. German represented that repayment in full would occur "pretty much by the end of the year."[7]

## B.     The Closing Documents.

¶ 8.    The transaction closed on September 5, 2023.[8] As planned, Plaintiff received $4.7 million in Class A membership units (the "Interest") in DCP 172 College Park Drive, LLC (the "Company"), the entity acquiring the apartments.[9] In form, the membership units were equity interests; in substance, they functioned primarily as collateral securing the short-term bridge loan.

¶ 9.    At closing, the parties executed three agreements: the Company Agreement, a Subscription Agreement, and a Side Letter.[10] The Side Letter is the agreement most pertinent here.

¶ 10.   The Side Letter established three interlocking protections. First, it imposed a personal obligation on German himself—not merely on the Company or Darcorp—to use reasonable efforts to reacquire Plaintiff's Interest by December 31, 2023.[11]

---

[7] *See id.* ¶ 14; DARWIN GERMAN REAL ESTATE INVESTMENTS, *We Closed On The Mark! September Meeting*, at 12:25 (YouTube, Sept. 14, 2023, https://youtu.be/Pi8gwhIN2IQ?si=wljJENvsufUpRyMc).
[8] Munster Decl. ¶ 10; *see* Pl.'s Ex. 2 (Purchaser's Statement) (App. 144).
[9] Purchaser's Statement (App. 145).
[10] Munster Decl. ¶¶ 11–12; Pl.'s Ex. 1-A (Side Letter); Pl.'s Ex. 1-C (Company Agreement of DCP 172 College Park Drive, LLC).
[11] Side Letter § I.3 (App. 78) ("The Principal shall take reasonable efforts to acquire 100% of the Interest by December 31, 2023."); *id.* § I.1 (App. 76) ("'Principal' means Darwin German, in his individual capacity.").

¶ 11. Second, it prohibited Defendants from retaining any fees or distributions arising from the Property until Plaintiff's Interest was fully redeemed, directing instead that all such amounts be paid to Plaintiff.[12] That prohibition had immediate practical significance: two fees totaling more than $1 million were due to Defendants at closing—a One-Time Fee of $25,000 and a Property Acquisition Fee of $1,050,000 (equal to 1.5% of the $70-million purchase price).[13]

¶ 12. Finally, the Side Letter gave Plaintiff a contractual escape valve. If an "Automatic Trigger" occurred—defined to include "a default under any material agreement related to the Property or the Company"[14]—Plaintiff could require German personally to repurchase its Interest for a defined price.[15] That right is at the center of this dispute.

**C.    The Breakdown.**

¶ 13. Following closing, Plaintiff periodically sought updates on the repayment of its $4.7-million Interest. Defendants frequently failed to respond to

---

[12] *Id.* § I.3 (App. 78) ("Until 100% of the Interest is acquired from [Plaintiff] pursuant to [Plaintiff]'s Put Right or a Call Right, or otherwise, [German], [Darcorp] or their affiliates will not take any fees or distributions directly or indirectly from the Property, and any fees or distributions otherwise payable to [German], [Darcorp] or their affiliates shall be paid to [Plaintiff].").

[13] Company Agreement § 6.11(a) (App. 102) ("At the closing of the purchase of the Property, the Company shall pay, or shall authorize, approve and consent to the Project Owner's payment of, an acquisition fee to the Sponsor or its affiliates of up to 1.5% of the purchase price of the Project."); *id.* § 6.11(b) (App. 102) ("At or following the closing of the purchase of the Property, the Company will pay the Manager or its Affiliate a one-time fee in the amount of $25,000.00 for activities and services performed relating to the formation and administration of the Company and the Offering.").

[14] Side Letter § I.1 (App. 75).

[15] *Id.* § I.2.a (App. 76–77).

those inquiries.[16] By December 31, 2023—the deadline by which German was required to have taken reasonable efforts to reacquire the Interest—no portion of Plaintiff's Interest had been repaid.[17]

¶ 14.   In the months following, Defendants represented on multiple occasions that proceeds from other transactions in their portfolio would be applied toward redeeming Plaintiff's Interest.[18] None of those funds materialized.[19] In October 2024, more than a year after closing, Plaintiff asked German directly what his backup plan was. His response, on October 29, 2024, left little room for ambiguity: "There is no possibility to have a plan B to come up with the capital to pay you off. . . . I am sorry that this has turned out as it has."[20]

¶ 15.   On November 7, 2025, Plaintiff formally exercised its Put Right, identifying $6,727,557 as the Put Repurchase Amount.[21] Plaintiff asserted that Defendants' conduct constituted one or more "Automatic Triggers," including the failure to remit fees and distributions otherwise payable to Defendants, the failure to take reasonable efforts to reacquire the Interest by December 31, 2023, and other alleged defaults under the parties' agreements.[22]

---

[16] Munster Decl. ¶ 15; Pl.'s Ex. 1-D (App. 129–43); Pl.'s Ex. 5 (App. 159–74).
[17] Munster Decl. ¶ 17.
[18] *Id.* ¶¶ 18, 23.
[19] *Id.* ¶ 26.
[20] *Id.* ¶ 28; Pl.'s Ex. 5 (App. 161).
[21] Munster Decl. ¶ 30; Pl.'s Ex. 1 (Investor's Put Exercise Notice) (App. 56).
[22] Investor's Put Exercise Notice (App. 58–68).

¶ 16. Defendants disputed that any Automatic Trigger had occurred and refused to honor the Put Right. This lawsuit followed.

## SUMMARY-JUDGMENT STANDARD

¶ 17. Summary judgment is governed by Texas Rule of Civil Procedure 166a. A movant "bears the burden to show that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law."[23] The nature of that burden varies by posture. A plaintiff must conclusively establish all essential elements of its claim.[24] A defendant must either conclusively negate at least one element of the plaintiff's claim or prove all elements of an affirmative defense.[25]

¶ 18. In evaluating whether a fact issue exists, a court takes as true all evidence favorable to the nonmovant, indulges every reasonable inference in the nonmovant's favor, and resolves any doubts against the movant.[26] A court may not weigh the evidence or resolve credibility determinations at this stage; its role is limited to deciding whether a genuine fact issue exists for trial. [27]

---

[23] *ConocoPhillips Co. v. Koopmann*, 547 S.W.3d 858, 865 (Tex. 2018) (citing TEX. R. CIV. P. 166a(c)).
[24] *See MMP, Ltd. v. Jones*, 710 S.W.2d 59, 60 (Tex. 1986) (per curiam).
[25] *Stanfield v. Neubaum*, 494 S.W.3d 90, 96 (Tex. 2016).
[26] *ConocoPhillips*, 547 S.W.3d at 865.
[27] *Huckabee v. Time Warner Ent. Co. L.P.*, 19 S.W.3d 413, 422–23 (Tex. 2000); *see also Ortega v. Pean*, No. 01-18-00249-CV, 2019 WL 1560859, at *10 (Tex. App.—Houston [1st Dist.] Apr. 11, 2019, pet. denied) (mem. op.) ("[I]f a summary judgment motion involves the credibility of affiants, or the weight to be given to evidence, the motion should not be granted." (internal quotation marks omitted)).

¶ 19. Questions of contract interpretation are often well suited for summary judgment.[28] In construing a contract, the Court's objective is to ascertain and give effect to the parties' intent as expressed in the agreement itself.[29] To do so, the Court considers the contract as a whole, harmonizing and giving effect to all provisions so that none are rendered meaningless.[30]

¶ 20. This analysis begins—and, if possible, ends—with the contract's plain language.[31] If the language is susceptible to a definite or certain legal interpretation, it is unambiguous and must be enforced as written.[32] If, on the other hand, the contract is susceptible to more than one reasonable interpretation, it is ambiguous.[33] Only in that circumstance may the court consider extraneous evidence "to determine the true meaning of the instrument."[34]

---

[28] *See Hallmark v. Port/Cooper-T. Smith Stevedoring Co.*, 907 S.W.2d 586, 590 (Tex. App.—Corpus Christi-Edinburg 1995, no writ); *Tellepsen Builders, L.P. v. Kendall/Heaton Assocs., Inc.*, 325 S.W.3d 692, 696 (Tex. App.—Houston [1st Dist.] 2010, pet. denied).

[29] *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011); *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003).

[30] *Italian Cowboy*, 341 S.W.3d at 333.

[31] *Id.* (citing *Progressive Cnty Mut. Ins. Co. v. Kelley,* 284 S.W.3d 805, 807 (Tex. 2009) (per curiam)).

[32] *J.M. Davidson*, 128 S.W.3d at 229; *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983).

[33] *Italian Cowboy*, 341 S.W.3d at 333 (citing *J.M. Davidson*, 128 S.W.3d at 229).

[34] *Id.* at 333–34 (quoting *David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 450–51 (Tex. 2008) (per curiam)).

## ANALYSIS

### A. Plaintiff may seek declaratory relief based on qualifying defaults under related agreements.[35]

¶ 21. Before reaching the merits, the Court addresses Defendants' threshold argument that Plaintiff cannot seek declaratory relief regarding alleged defaults under agreements to which Plaintiff is not a party.[36] This argument, while having some surface appeal, misconstrues the nature of Plaintiff's claim.

¶ 22. Plaintiff does not seek to enforce rights under someone else's contract. It seeks to enforce the Side Letter—its own contract—which expressly conditions the Put Right on the occurrence of "a default under any material agreement related to the Property or the Company."[37] That language appears there by design; the parties chose it to define the circumstances under which the Put Right could be exercised. Accordingly, whether such a default occurred is not a collateral issue, but the very condition the contract requires the Court to evaluate.

¶ 23. Plaintiff's claim is thus a routine exercise in contract interpretation. It asks the Court to read its contract, identify the conditions that govern its rights, and determine whether those conditions have been satisfied. Courts do this every day. The fact that the analysis requires examining a related agreement is unremarkable;

---

[35] For a more in-depth analysis of this issue, see the Court's April 21, 2026 Order Denying Defendants' Second Amended Rule 166(g) Motion for Pretrial Conference.

[36] *See* Defs.' 2d Am. Rule 166(g) Mot. for Pretrial Conference ¶¶ 22–30.

[37] Side Letter § I.1 (App. 75).

contract rights frequently turn on facts and documents outside the four corners of the instrument being enforced.[38]

¶ 24. Defendants' argument also fails for the additional reason that it would strip the Automatic Trigger provision of any operative effect. The Side Letter expressly ties Plaintiff's rights to the occurrence of "a default under any material agreement related to the Property or the Company."[39] Under Defendants' view, however, Plaintiff could never obtain a judicial determination whether a default occurred—because it would always be someone else's contract. That reading would leave the provision with nothing to do, reducing it to words on paper—negotiated, written, and signed, but incapable of enforcement. Texas law does not permit that result. Courts construe contracts to give effect to every provision, not to leave negotiated language inert.[40]

¶ 25. The Court therefore holds that Plaintiff may seek declaratory relief as to whether a qualifying default occurred, to the extent that determination bears on Plaintiff's rights under the Side Letter.

---

[38] *See, e.g.*, *McCalla v. Ski River Dev., Inc.*, 239 S.W.3d 374, 380 (Tex. App.—Waco 2007, no pet.) (recognizing that plaintiff's rights under its own contract were affected by enforcement of a third-party contract); *Tesch v. Equity Secured Cap., L.P.*, No. 03-13-00539-CV, 2015 WL 8587311, at *4 n.8 (Tex. App.—Austin Dec. 11, 2015, pet. denied) (mem. op.) (analyzing cross-default provision in deed of trust to conclude that uncured default under promissory note was a default under deed of trust); *Berman v. Rife*, 644 S.W.2d 574, 576–78 (Tex. App.—Fort Worth 1982, writ ref'd n.r.e.) (finding that parties' obligations in real property sale were conditioned upon buyer securing financing from third party).

[39] Side Letter § I.1 (App. 75).

[40] *Italian Cowboy*, 341 S.W.3d at 333.

**B. The term "default" is unambiguous.**

¶ 26. With that threshold question resolved, the Court turns to what "default" means. Defendants insist the term is ambiguous because the Side Letter incorporates defaults from multiple underlying agreements—each of which recognizes different categories of default, including events of default subject to cure periods, extended-cure defaults, and various forms of "Manager Defaults" and "Manager Bad Act Defaults"—without specifying which of those categories qualify as an "Automatic Trigger."[41] In Defendants' view, the absence of such distinctions renders the term indeterminate. The Court disagrees.

¶ 27. It is useful to begin by clarifying what ambiguity means—and what it does not mean—in contract law. A term is not ambiguous merely because the parties disagree about it.[42] If that were enough, ambiguity would exist in virtually every contested contract case. Ambiguity arises only when, after applying the ordinary tools of construction, a term is reasonably susceptible to more than one meaning.[43]

¶ 28. That is not the circumstance here. Defendants' argument rests on the premise that because the referenced agreements employ more granular taxonomies of default, the unqualified use of the word "default" in the Side Letter must be unclear. But the Side Letter does not adopt those agreements' internal

---

[41] *See* Defs.' Resp. ¶¶ 9–13.
[42] *FPL Energy, LLC v. TXU Portfolio Mgmt. Co., L.P.*, 426 S.W.3d 59, 63 (Tex. 2014) ("[W]e will not find ambiguity simply because the parties disagree over a contract's meaning.").
[43] *Id.*

classifications. It does not distinguish among "material," "technical," or "curable" defaults, nor does it limit the term by reference to any particular subset. Instead, it uses the unmodified term "default."[44] When contracting parties choose a general term without qualification—particularly in a provision designed to operate as an objective trigger—courts do not supply limitations the parties did not include.[45]

¶ 29.  The ordinary meaning of "default" confirms this reading. The noun "default" means a "failure to do something required by duty or law."[46] That definition is straightforward and widely understood.[47] Nothing in the term itself requires that the failure be material, incurable, or formally declared. By defining an "Automatic Trigger" to include "a default under any material agreement related to the Property or the Company," the parties signaled that the occurrence of *any* default—of whatever type—would suffice. Indeed, it is telling that the parties used

---

[44] Side Letter § I.1 (App. 75).

[45] *See TotalEnergies Petrochemicals & Refin. USA, Inc. v. Kinder Morgan Petcoke, LP*, 658 S.W.3d 647, 663 (Tex. App.—Houston [14th Dist.] 2022, pet. denied) (citing *URI, Inc. v. Kleberg Cnty.*, 543 S.W.3d 755, 771 n.81 (Tex. 2018)) ("Courts do not interpret contracts as if to insert provisions the parties could have included, nor do we imply restraints for which they have not bargained.").

[46] *Default*, MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/default (last visited Apr. 17, 2026); *see also Pharr-San Juan-Alamo Indep. Sch. Dist. v. Tex. Pol. Subdivisions Prop./Cas. Joint Self Ins. Fund*, 642 S.W.3d 466, 474 (Tex. 2022) (referring to dictionary definitions "[t]o determine the common, ordinary meaning of undefined terms used in contracts").

[47] *E.g., Sangani v. Barber*, No. 05-24-00237-CV, 2026 WL 95430, at *13 (Tex. App.—Dallas Jan. 13, 2026, no pet.) (mem. op.) ("'[D]efault' is a noun that means 'failure to meet an obligation' or 'the omission or failure to perform a legal or contractual duty; esp[ecially], the failure to pay a debt when due.'" (quoting *Default*, BLACK'S LAW DICTIONARY (12th ed. 2024))); *Limestone Grp., Inc. v. Sai Thong, L.L.C.*, 107 S.W.3d 793, 797 (Tex. App.—Amarillo 2003, no pet.) (defining "default" as "the 'failure' to do an act" (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY UNABRIDGED 950 (1976))); *Groschke v. Gabriel*, 824 S.W.2d 607, 611 (Tex. App.—Houston [1st Dist.] 1991, writ denied) (defining "default" as "[a]n omission of that which ought to be done. Specifically, the omission or failure to perform a legal or contractual duty" (quoting *Default*, BLACK'S LAW DICTIONARY (12th ed. 2024))).

the adjective "material" to modify only the type of agreement, not the type of default.

¶ 30. The Side Letter's structure confirms this reading. Elsewhere in the agreement, when the parties intended to limit the concept, they did so expressly by using the phrase "material default."[48] The inclusion of that qualifier in one provision, and its omission in the Automatic Trigger definition, reflects a deliberate drafting choice.[49] Had the parties intended to confine the Automatic Trigger provision to particular types of defaults—uncured defaults, material defaults, financial defaults—they would have done so expressly. They did not.

¶ 31. The Court's task is to interpret the contract as written, not to revise it after the fact.[50] Having chosen not to limit the term "default" in the definition of "Automatic Trigger," Defendants cannot now ask the Court to supply a limitation that the parties themselves omitted.

¶ 32. The Court therefore applies the term "default" according to its ordinary meaning: the failure to perform a legal or contractual obligation. Any such default under a qualifying agreement is sufficient to constitute an Automatic Trigger.

---

[48] Side Letter § III.1 (App. 79) ("The agreements expressly made by the undersigned in this Side Letter shall be binding upon such parties only at such times as . . . (ii) [Plaintiff] is not in material default of its obligations under the Company Agreement.").

[49] *Limestone Grp.*, 107 S.W.3d at 797 (holding that because the contracting parties "omitted words from the contract modifying the degree of default needed," the court would not "affix words of qualification or measure to it, such as substantial or material").

[50] *Sundown Energy LP v. HJSA No. 3, Ltd. P'ship*, 622 S.W.3d 884, 889 (Tex. 2021) (per curiam) ("As we have said time and again, courts may not rewrite a contract under the guise of interpretation.").

**C.     The term "payable" is unambiguous.**

¶ 33.   The parties also dispute the meaning of "payable" as it appears in Section I.3 of the Side Letter, which directs that "fees or distributions otherwise payable" to Defendants must instead be remitted to Plaintiff until its Interest is redeemed. Defendants argue that an amount is "payable" only if the obligor has the funds actually available to pay it—in essence, that liquidity is a predicate to obligation.[51] Plaintiff responds that "payable" refers to amounts that are due or owed, regardless of whether the obligor currently has the means to satisfy them.[52] The Court agrees with Plaintiff.

¶ 34.   The Court starts with ordinary usage. "Payable," as an adjective, refers to a sum of money "that is to be paid"[53] or "may, can, or must be paid."[54] That formulation speaks to the existence of an obligation, not to the obligor's ability to satisfy the obligation at a given time. An invoice is payable on its due date, for example, whether or not the debtor has sufficient funds. A promissory note is payable on its terms regardless of the maker's liquidity. This is how the word is ordinarily

---

[51] *See* Defs.' Resp. ¶¶ 18–21.

[52] *See* Pl.'s Reply 4–5.

[53] *Lufkin Mall Realty Holding LLC v. Lufkin Inv. Partners LLC*, 721 S.W.3d 629, 636 (Tex. App.—Tyler 2025, no pet.) (holding that "'payable' refers to a sum of money ... that is to be paid" (quoting *Payable*, BLACK'S LAW DICTIONARY (12th ed. 2024))).

[54] *Payable*, MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/payable (last visited Apr. 17, 2026); *Loyd v. Loyd*, No. 02-24-00284-CV, 2025 WL 2087932, at *7 (Tex. App.—Fort Worth July 24, 2025, pet. denied) (mem. op.) (quoting *Payable*, MERRIAM-WEBSTER ONLINE DICTIONARY).

understood.[55] Under Defendants' construction, a contractual obligation would fluctuate along with an account balance—a result the contract does not support and commercial practice does not contemplate.[56]

¶ 35. The transaction documents themselves leave no room for dispute: the relevant fees were legally due at closing. The One-Time Fee and the Property Acquisition Fee were not contingent, discretionary, or subordinate to other payment priorities. They were fixed obligations that arose upon closing, as the governing agreements expressly provide.[57] Defendants do not contend otherwise. They do not argue that the obligations never arose, that any condition precedent was unsatisfied, or that the agreements did not require payment. To the contrary, Defendants acknowledged at the summary-judgment hearing that the fees were owed at closing. Their only rejoinder is that the Company lacked sufficient funds to pay them.[58] But that is not a defense to liability—it is, at most, an explanation for nonperformance.

¶ 36. The law has long distinguished between the existence of a debt and the ability to pay it.[59] A debt or contractual duty to pay does not disappear simply

---

[55] *E.g., Loyd*, 2025 WL 2087932, at *7 (holding that "salaries payable to [Husband]" included all net income received by husband's pass-through entity, whether actually paid to him or not) (alteration in original)).

[56] *See FPL Energy, LLC,* 426 S.W.3d at 63 ("[W]e construe contracts from a utilitarian standpoint bearing in mind the particular business activity sought to be served.").

[57] Company Agreement § 6.11(a)–(b) (App. 102).

[58] Defs.' Resp. ¶¶ 19–20; Defs.' Ex. A (German Aff.) ¶ 12.

[59] *See, e.g., Black v. Vaughan*, 7 S.W. 604, 604 (Tex. 1888) (recognizing debtor's indebtedness and, independently, his insolvency); *Patranella v. Smith*, 102 S.W.2d 297, 298 (Tex. App.—Waco 1937, writ dism'd) (concluding that debt owed by insolvent heir to deceased parents' estate could still be collected through appropriation of heir's interest in estate); *Castro v. Castro*, No. 14-11-01087-CV, 2013 WL 1928742, at *7 (Tex. App.—Houston [14th Dist.] May 9, 2013, no pet.) (mem. op.) (holding that financial inability to

because payment would be difficult or burdensome.[60] A party can be flat broke and still owe every penny. Defendants' argument is, in effect, a claim of impossibility of performance—but economic impracticability is not a recognized defense in Texas.[61] As the Dallas Court of Appeals observed nearly a century ago, even the financial strains of the Great Depression did not excuse a party from contractual payment obligations where the contract itself contained no such relief.[62] The same principle applies here.

¶ 37.    The Court therefore concludes that "payable," as used in Section I.3, is unambiguous and refers to amounts that are legally due or owed, without regard to the obligor's present ability to pay.

## D.    Section I.3 is limited to Property-related fees and distributions.

¶ 38.    Although the Court agrees with Plaintiff on the meaning of "payable," it does not adopt Plaintiff's broader reading of Section I.3. That provision is more limited in scope than what Plaintiff contends.

---

pay amount due under agreement did not discharge party's duty to pay); *see also Debt*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("Liability on a claim; a specific sum of money due by agreement or otherwise.").
[60] *See ATC Indoor DAS LLC v. MM CCM 48M Leasing, LLC*, No. 05-24-00769-CV, 2026 WL 265487, at *8–9 (Tex. App.—Dallas Jan. 29, 2026, no pet.) (mem. op.) (holding that loss of customers and resulting financial losses did not excuse performance under license-fee revenue agreement).
[61] *See Huffines v. Swor Sand & Gravel Co.*, 750 S.W.2d 38, 40 (Tex. App.—Fort Worth 1988, no writ); *Alamo Clay Prods., Inc. v. Gunn Tile Co. of S.A.*, 597 S.W.2d 388, 392 (Tex. App.—San Antonio 1980, writ ref'd n.r.e.); *see also Hankins v. Burnett*, No. 07-24-00351-CV, 2025 WL 1230474, at *3 (Tex. App.—Amarillo Apr. 28, 2025, no pet.) (mem. op.) (holding that market shifts caused by COVID-19 pandemic did not qualify as impossibility excusing contractual performance); *Castro*, 2013 WL 1928742, at *7 ("[Appellant]'s impossibility argument was based on his personal financial inability to fulfill his obligations under the agreement. This was a subjective impossibility, which did not excuse his performance.").
[62] *Levy Plumbing Co. v. Standard Sanitary Mfg. Co.*, 68 S.W.2d 273, 274 (Tex. App.—Dallas 1933, writ ref'd).

¶ 39. Section I.3 operates in two parts.[63] First, it prohibits Defendants from taking fees or distributions from the Property. Second, it provides that any such fees or distributions otherwise payable to Defendants must instead be remitted to Plaintiff until its Interest is fully redeemed. Read together, these clauses address a single category of funds: money arising from the Property. The provision identifies a specific pool of money, tells Defendants they cannot keep it, and directs where it must go instead.

¶ 40. Plaintiff would extend this provision more broadly to include fees and income from unrelated properties and ventures in Defendants' larger portfolio.[64] The text does not support that reading. The Side Letter governs a specific transaction involving a particular Property and the entity formed to acquire it.[65] It is not a sweeping assignment of every dollar Defendants might earn from any source. Adopting Plaintiff's interpretation would transform a targeted repayment mechanism into something closer to a general lien on Defendants' entire business operations—a result the language does not support and the parties almost certainly did not intend.

---

[63] Side Letter § I.3 (App. 78) ("Until 100% of the Interest is acquired from [Plaintiff] pursuant to [Plaintiff]'s Put Right or a Call Right, or otherwise, [German], [Darcorp] or their affiliates will not take any fees or distributions directly or indirectly from the Property, and any fees or distributions otherwise payable to [German], [Darcorp] or their affiliates shall be paid to [Plaintiff].").

[64] Pl.'s Mot. ¶¶ 67–71.

[65] See FPL Energy, LLC, 426 S.W.3d at 63 ("[W]e construe contracts from a utilitarian standpoint bearing in mind the particular business activity sought to be served.").

¶ 41.  Context confirms the narrower reading.[66] Contracts are interpreted in light of their subject matter. Here, that subject matter is the Property and the parties' economic relationship arising from its sale. The most coherent reading of Section I.3 is the one that keeps it anchored to that context: fees and distributions arising from the Property, redirected to Plaintiff until it is made whole.

¶ 42.  The Court therefore concludes that Section I.3 applies only to fees and distributions arising from the Property. To the extent Plaintiff's summary-judgment theories rest on alleged failures to remit funds from unrelated transactions, those theories do not establish an Automatic Trigger.

**E.    The record does not conclusively establish a confidentiality breach.**

¶ 43. Plaintiff also contends that German's public disclosure of the transaction—in a YouTube video posted after closing[67]—breached the Side Letter's confidentiality provision and independently satisfied a separate Automatic Trigger.[68] The Court takes this concern seriously, of course. At the summary-judgment stage, however, the relevant inquiry is not whether German spoke publicly about the transaction, but whether the record conclusively establishes that his statements violated the confidentiality provision.

---

[66] *See Krause v. Chen*, No. 05-21-00470-CV, 2023 WL 2596073, *3 (Tex. App.—Dallas Mar. 22, 2023, no pet.) (mem. op.) ("Understanding the context in which an agreement was made is essential in determining the parties' intent as expressed in the agreement.").
[67] DARWIN GERMAN REAL ESTATE INVESTMENTS, *We Closed On The Mark! September Meeting*, *supra*.
[68] Pl.'s Mot. ¶¶ 72–74.

¶ 44. On that question, the record falls short. The confidentiality provision does not bar all public discussion; it prohibits disclosure of the Side Letter, which necessarily includes its terms.[69] The summary-judgment evidence shows only that German described the transaction in broad, high-level terms in a public forum—not that he revealed any specific, term-level, or otherwise protected information under the Side Letter.

¶ 45. Those evidentiary gaps are dispositive at this stage. To prevail on summary judgment, Plaintiff must do more than show that a disclosure occurred; it must show that the disclosure was the type the contract forbids.[70] The record does not do so with the certainty required to eliminate a fact question. The alleged confidentiality breach therefore cannot serve as a standalone basis for summary judgment on this record.

---

[69] Side Letter § II (App. 79) ("The parties hereto agree to maintain the confidentiality of this Side Letter, and except where its production is required by a party to discharge its legal, regulatory, or professional obligations, they agree not to disclose it to any person or entity other than the other investors and prospective investors in the Company . . . and the other investors and prospective investors in [Plaintiff], and their own partners and professional advisors.").

[70] *See MMP, Ltd.*,710 S.W.2d at 60 (stating that plaintiff must conclusively prove all elements of its claim to be entitled to summary judgment); *Joselevitz v. Roane*, No. 14-18-00172-CV, 2020 WL 1528020, at *6 (Tex. App.—Houston [14th Dist.] Mar. 31, 2020, no pet.) (mem. op.) (concluding that trial court did not err in awarding no-evidence summary judgment and declining to construe confidentiality provision so broadly as to "read out the portions limiting the provision's scope to disclosure of the agreement, its terms, and [appellant's] identity as a party released by the agreement").

**F.     Whether Defendants exercised "reasonable efforts" presents a fact issue.**

¶ 46. Plaintiff also contends that Defendants failed to use "reasonable efforts" to reacquire Plaintiff's Interest by the December 31, 2023 deadline.[71] This theory likewise cannot be resolved as a matter of law on the present record.

¶ 47. The concept of "reasonable efforts" is inherently contextual.[72] It depends on the actions taken, the alternatives available, and the commercial circumstances facing the parties at the relevant time. In some cases, the record may be so one-sided as to permit resolution as a matter of law.[73] A party that took no action at all, for example, might not be able to manufacture a fact issue simply by invoking the word "reasonable." But this is not that case. The record here contains competing evidence about what steps Defendants actually took, what options were realistically available, and whether German's conduct fell below the contractual standard or merely failed to produce the desired result.[74]

---

[71] Pl.'s Mot. ¶¶ 75–80.

[72] *See Nissan N. Am., Inc. v. Tex. Dep't of Motor Vehicles*, 592 S.W.3d 480, 494 (Tex. App.—Texarkana 2019, no pet.) ("[T]he interjection of the term 'reasonable' into a contract virtually always creates a question of fact."); *Frasier v. Schauweker*, 915 S.W.2d 601, 604 (Tex. App.—Houston [14th Dist.] 1996, no writ) (explaining that whether a buyer used "reasonable efforts" to secure financing "is usually a question of fact for the jury because reasonable minds can generally differ as to whether a reasonable effort has been made in a particular case") ; *Fisch v. Transcon. Ins. Co.*, 356 S.W.2d 186, 192 (Tex. App.—Houston 1962, writ ref'd n.r.e.) ("Ordinarily what is 'reasonable' is a question of fact.").

[73] *See Nissan N. Am., Inc.*, 592 S.W.3d at 494 ("It is true that Texas courts have held that when the facts are undisputed and 'only one reasonable inference can be drawn from the evidence,' the issue becomes a question of law.").

[74] German Aff. ¶¶ 18–19; DARWIN GERMAN REAL ESTATE INVESTMENTS, *We Closed On The Mark! September Meeting*, *supra*; Pl.'s Ex. 1-D (App. 129-31, 137–38, 141–42); Pl.'s Ex. 5 (App. 163–64).

¶ 48. It also does not help that the agreement provides no objective, measurable standard for reasonableness. When a contract employs "reasonable efforts" without reducing it to something objective and verifiable—a minimum number of contacts, a specific capital-raising threshold, a documented process—the inquiry almost always turns on facts about what was done, what could have been done, and what the parties reasonably expected. This case is no different.

¶ 49. The Court therefore declines to grant summary judgment on the "reasonable efforts" theory. That conclusion is not a vindication of German's conduct. The record suggests that what Defendants characterized as "efforts" amounted to little more than general solicitations of outside investors—the very strategy that Plaintiff had been told was not the intended mechanism for repayment. Whether that satisfies the contractual standard remains a question for another day.

**G.    Plaintiff has conclusively established a default based on Defendants' failure to remit the One-Time Fee and Property Acquisition Fee.**

¶ 50. The Court now turns to the theory on which summary judgment properly rests.

¶ 51. The analysis is straightforward once the meaning of "payable" is established. The record shows that certain fees were legally owed, that the Side Letter required those fees to be paid to Plaintiff, and that they were not. That conclusion follows from four steps.

¶ 52. First, the One-Time Fee ($25,000) and the Property Acquisition Fee ($1,050,000) were contractual obligations that arose at closing. The Company Agreement identifies both fees and provides they are due at closing.[75] Nothing in the record creates a genuine dispute that they became legally due at that moment. Nor do Defendants point to any provision making those obligations contingent, optional, or subject to available cash.

¶ 53. Second, those fees were "payable" within the meaning of Section I.3 because they were legally owed. Again, Defendants do not dispute that the obligation existed; they argue only that the Company lacked the liquidity to satisfy it. As the Court has explained, that argument does not alter the analysis. A debt may be both payable and unpaid at the same time. That is, in fact, the ordinary premise of a breach-of-contract action.

¶ 54. Third, both fees fall squarely within the category of funds covered by Section I.3. That provision directs that any fees or distributions payable to Defendants "directly or indirectly from the Property" shall be paid to Plaintiff until Plaintiff's Interest is fully redeemed.[76] There is no question that both fees arise from

---

[75] Company Agreement § 6.11(a)–(b) (App. 102).
[76] Side Letter § I.3 (App. 78).

the Property transaction itself—one of them is literally calculated as a percentage of the Property's purchase price.[77]

¶ 55.  Fourth, it is undisputed that Defendants did not remit those amounts to Plaintiff.[78]

¶ 56.  This sequence establishes a default as a matter of law. The fees were contractual obligations that arose at closing. They were therefore "payable." Section I.3 required that such amounts be paid to Plaintiff until its Interest was redeemed. And it is undisputed that Defendants did not remit those amounts.

## H.     That default constitutes an "Automatic Trigger."

¶ 57.  The final question is whether the default qualifies as an "Automatic Trigger" under the Side Letter. The answer is yes.

¶ 58.  The Side Letter defines "Automatic Trigger" to include "a default under any material agreement related to the Property or the Company."[79] The Side Letter itself plainly qualifies as a material agreement. It is not a peripheral instrument sitting at the edges of the transaction. It is one of the foundational documents executed at closing to govern precisely this kind of dispute—what happens to Plaintiff's money, who is obligated to repay it, and what rights spring

---

[77] Company Agreement § 6.11(a) (App. 102) ("At the closing of the purchase of the Property, the Company shall pay, or shall authorize, approve and consent to the Project Owner's payment of, an acquisition fee to the Sponsor or its affiliates of up to 1.5% of the purchase price of the Project.").
[78] Munster Decl. ¶ 29; German Aff. ¶ 12.
[79] Side Letter § I.1 (App. 75).

into existence if that obligation is not honored. An agreement of that character, governing those economic stakes, easily qualifies as material.[80]

¶ 59.  It is equally clear that Defendants defaulted under the Side Letter by failing to remit the Property-related fees that were payable to Plaintiff. That default falls within the express definition of "Automatic Trigger." No additional default is required, and no other theory needs to succeed. The Put Right was triggered, Plaintiff exercised it,[81] and German—who guaranteed payment of the Put Repurchase Amount—did not pay.

¶ 60.  This result follows directly from the agreement the parties executed. The protections Plaintiff negotiated were designed to operate in precisely these circumstances. The Court enforces the contract as written.

## CONCLUSION

¶ 61.  This case narrows, on close inspection, to a straightforward matter of contract enforcement. The parties agreed that certain defaults would have defined consequences. They chose broad language in some places and narrower language in

---

[80] *See Material*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("Of such a nature that knowledge of the item would affect a person's decision-making; significant; essential."); *see also In re State Bar of Tex.*, No. 13-23-00009-CV, 2023 WL 2534067, at *6 n.4 (Tex. App.—Corpus Christi-Edinburg Mar. 15, 2023, orig. proceeding) (mem. op.) ("Material has been defined as 'having real importance or great consequences.'" (quoting *Wolf Hollow I, L.P. v. El Paso Mktg., L.P.*, 472 S.W.3d 325, 335 (Tex. App.—Houston [14th Dist.] 2015, pet. denied))).

[81] Investor's Put Exercise Notice (App. 56).

others. The Court's task is not to improve that bargain, or to soften it, or to save either side from its consequences.[82]

¶ 62.  Under that agreement, the One-Time Fee and the Property Acquisition Fee were Property-related obligations that were legally owed at closing and therefore "payable." Section I.3 required those amounts to be paid to Plaintiff. They were not. That failure constituted a default under the Side Letter, and the contract expressly provides that such a default triggers Plaintiff's Put Right.

¶ 63.  Although Plaintiff's other asserted theories do not independently support summary judgment, this one does. That is enough.

¶ 64.  Plaintiff's Traditional Motion for Summary Judgment is **GRANTED**.

IT IS SO ORDERED.

_____
BRIAN STAGNER
Judge, Texas Business Court,
Eighth Division

SIGNED: May 6, 2026

---

[82] *Provident Fire Ins. Co. v. Ashy*, 162 S.W.2d 684, 687 (Tex. [Comm'n Op.] 1942) ("Parties make their own contracts, and it is not within the province of this court to vary their terms in order to protect them from the consequences of their own oversights and failures in nonobservance of obligations assumed.").