2026 Tex. Bus. 34



THE BUSINESS COURT OF TEXAS
ELEVENTH DIVISION

| | | |
|---|---|---|
| ENERGY FOUNDERS FUND, LP, | § | |
| | § | |
| *Plaintiff/Counter-Defendant*, | § | |
| | § | |
| v. | § | |
| | § | |
| PHILLIP DASKEVICH and CRIS | § | |
| CURNUTT DASKEVICH, | § | |
| | § | |
| *Defendants/Counter-Plaintiffs*, | § | |
| | § | Cause No. 26-BC11A-0004 |
| | § | |
| PHILLIP DASKEVICH and CRIS | § | |
| CURNUTT DASKEVICH, both | § | |
| individually, and derivatively on | § | |
| behalf of GAGE WESTERN LLC, | § | |
| | § | |
| *Third-Party Plaintiffs*, | § | |
| | § | |
| v. | § | |
| | § | |
| GAGE WESTERN LLC, et al., | § | |
| | § | |
| *Third-Party Defendants*. | § | |

**MEMORANDUM OPINION AND ORDER ON CROSS-MOTIONS FOR PARTIAL
SUMMARY JUDGMENT ON AFFILIATE STATUS**

# INTRODUCTION

¶ 1.    This corporate governance dispute arises from the sale of ownership interests in Gage Western, LLC ("Gage Western"). At its core, the controversy turns on a single contractual term: "Affiliate." Although the term appears in only one operative provision of Gage Western's Third Amended and Restated Limited Liability Company Agreement (the "Company Agreement"), it has spawned competing interpretive theories, cross-motions for summary judgment, and a sprawling evidentiary record.

¶ 2.    The battlefield is the Company Agreement's "drag along" provision—a common corporate mechanism that allows a majority owner, under certain conditions, to compel minority owners to participate in a sale of the entire company. The dispositive question is whether Plaintiff Energy Founders Fund, LP ("EFF") validly triggered that right when it pursued a sale of its interest. The answer depends on whether the buyer, GW Allen, LLC ("GW Allen"), was an "Affiliate" of EFF when the transaction occurred.

¶ 3.    Under the Company Agreement, a drag-along transaction is valid only if it is a bona fide sale to a purchaser that is *not* an Affiliate of the dragging member. Defendant Phillip Daskevich contends that GW Allen, though structured as an independent third-party buyer, was, in reality, EFF's Affiliate. He emphasizes that as part of the broader deal structure, EFF bargained for substantial post-closing

governance rights in GW Allen, including future board seats and veto powers. In his view, because the overall transaction was dependent on EFF obtaining these future interests, the target vehicle became an Affiliate of EFF prior to closing.

¶ 4.    EFF counters with a straightforward temporal argument: the Company Agreement defines an "Affiliate" exclusively in terms of *existing* control—not future rights that spring into existence only after the ink dries on the closing documents. According to EFF, the relevant inquiry is whether it actually possessed the power to direct GW Allen's management or policies before the transaction closed. EFF contends that, until closing occurred, GW Allen was owned and controlled exclusively by PJC Investments, LLC ("PJC"), an independent third party, and that EFF possessed no present governance authority over GW Allen whatsoever.

¶ 5.    Having considered the briefing, evidence, arguments of counsel, and applicable law, the Court concludes that EFF's interpretation is the correct one. The Company Agreement's definition of "Affiliate" requires present, existing control, not contingent future rights that materialize only after a transaction is consummated. While the Court agrees with Daskevich that the transaction documents must be read together, those documents ultimately confirm that GW Allen remained under PJC's exclusive control until closing. Because EFF lacked any present authority over GW Allen before that time, GW Allen was not its Affiliate. Daskevich's motion is therefore **DENIED**, and EFF's cross-motion is **GRANTED**.

## BACKGROUND

**A.      The Company Agreement and the parties' ownership structure**

¶ 6.      Gage Western is governed by its Company Agreement dated March 3, 2020.[1] The Agreement establishes a multi-class ownership structure and regulates, among other matters, transfers of membership interests and the exercise of drag-along rights.

¶ 7.      EFF held Class A membership interests in the Company, while Phillip and Cris Daskevich held substantial minority interests through Class B and other units.[2] Phillip Daskevich also served as the Class B Director. The board consisted of three directors: a Class A Director, a Class B Director, and a Management Director.[3]

¶ 8.      Article 9 of the Agreement governs transfers of membership interests. Section 9.2 provides that a selling member—designated as the "Dragging Member"—may compel all other members to liquidate their units in connection with a "Controlling Sale." The Agreement defines a Controlling Sale as "a bona fide sale . . . to one or more persons who are not Affiliates of the Dragging Member."[4] To invoke this mechanism, the Dragging Member must issue a "Drag Along Notice" to the remaining members "either before or after a Notice of Proposed Transfer."[5]

---

[1] Def.'s Ex. A (Gage Western Company Agreement).
[2] *Id*. at Schedule 1.
[3] *Id*. § 7.1(b).
[4] *Id*. § 9.2(c).
[5] *Id*.

¶ 9.    The Company Agreement defines "Affiliate" as follows:

> "Affiliate" means, when used with reference to a specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with the Person specified. For purposes of the foregoing, "control," "controlled by" and "under common control with" with respect to any Person shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person . . . whether through the ownership of voting securities, partnership interests or other equity interests, or by contract or otherwise.[6]

¶ 10.    That definition is the fulcrum on which this dispute turns.

## B.    The proposed sale to PJC and the formation of GW Allen

¶ 11.    In mid-2024, EFF entertained a strategic offer to sell its interest in Gage Western to PJC, an independent investment firm. PJC's letter of intent ("LOI") proposed that "PJC Investments, LLC, or any of its subsidiaries" would acquire Gage Western for $4.5 million.[7] The LOI explicitly contemplated that PJC might complete the purchase through a newly formed acquisition subsidiary formed for that purpose—a routine feature of modern commercial transactions.[8]

¶ 12.    Following initial negotiations, PJC formed GW Allen to serve as that special-purpose acquisition vehicle. Coleman Curry, a member and Chief Operating

---

[6] *Id.* § 1.8.

[7] Pl.'s Ex. 3 (LOI).

[8] *See* Sandra Feldman, *The Different Types and Methods of Mergers and Acquisitions*, WOLTERS KLUWER (Aug. 7, 2024), https://www.wolterskluwer.com/en/expert-insights/the-different-types-and-methods-of-mergers-and-acquisitions (explaining that, in a triangular merger, "the subsidiary will be newly formed for the sole purpose of assisting the parent in acquiring the target"); *see also* Pl.'s Ex. 15 (Curry Aff.) ¶ 5.

Officer of PJC, formally organized GW Allen in September 2024 and served as its sole manager.[9] Under its organizational documents, GW Allen was structured as a manager-managed limited liability company, vesting all management authority in Curry alone.[10] PJC was GW Allen's only member and sole equity owner.[11]

¶ 13.  Curry's undisputed testimony confirms this governance structure. He attested that, at all times before the November 15, 2024 closing: (a) PJC owned 100% of GW Allen's membership interests; (b) EFF held no equity stake or membership interest in GW Allen; (c) EFF possessed no right to manage or direct GW Allen; (d) EFF lacked any legal authority to bind GW Allen; and (e) every decision concerning GW Allen—from its initial capitalization to its pursuit of Gage Western—was made exclusively by PJC through Curry as manager.[12]

¶ 14.  John Donovan likewise attested on behalf of EFF that "[a]t no time prior to the closing of the transaction on November 15, 2024 did EFF: have any right to direct or control GW Allen's management or policies; have any voting rights or governance rights in GW Allen; have any contractual rights to control GW Allen; or exercise any control over GW Allen's operations or decision making."[13] Donovan stated that EFF's negotiations with PJC regarding GW Allen's future governance

---

[9] Pl.'s Exs. 7–9 (Minutes of Organizational Meeting), 8 (Certificate of Formation), and 9 (Certificate of Authority); Curry Aff. ¶¶ 2–3.

[10]  *See* Pl.'s Exs. 7–9; Curry Aff. ¶ 3.

[11] Ex. 3.1 to Pl.'s Ex. 10 (GW Allen Company Agreement).

[12] Curry Aff. ¶¶ 2–4.

[13] Pl.'s Ex. 18 (Donovan Aff.) ¶ 4.

structure "related only to a potential future ownership and governance structure after closing; were contingent on the transaction closing and EFF receiving equity; and did not grant EFF any present rights to control GW Allen before closing."[14]

¶ 15.  On August 7, 2024, EFF issued a Notice of Transfer of Units to the remaining members, outlining its intent to execute a "Controlling Sale" under Section 9.2 and advising them of their contractual right of first offer.[15] In September 2024, the Gage Western board approved EFF's transfer pursuant to a proposed Membership Interest Purchase Agreement ("MIPA").[16] The MIPA was approved by majority vote over the objection of Phillip Daskevich, who contested whether GW Allen qualified as a non-affiliate purchaser and argued that the deal required additional corporate approvals.

¶ 16.  As the transaction advanced toward closing, EFF and PJC negotiated a future governance framework for the post-acquisition operating company.[17] These negotiations culminated in a proposed First Amended and Restated Limited Liability Company Agreement for GW Allen ("A&R Agreement").[18] This document, designed to take effect *after* closing, outlined a new governing matrix for GW Allen that would grant EFF board-designation rights, quorum protections, and veto authority over

---

[14] *Id.* ¶ 6.
[15] Def.'s Ex. E (Notice of Transfer of Units); Pl.'s Ex. 12 (Notice of Right of First Offer).
[16] Pl.'s Exs. 6 (Written Consent of Board), 17 (Meeting Minutes) ¶ 11.
[17] Curry Aff. ¶ 7; Donovan Aff. ¶ 6.
[18] Ex. D (proposed A&R Agreement) to Pl.'s Ex. 4.

certain corporate actions.[19] In his affidavit, Curry stated that the A&R Agreement was inoperative prior to closing, and that the pre-closing drafts were blueprints for future governance rather than reflections of present control.[20]

¶ 17. On November 15, 2024, EFF issued its formal Drag Along Notice to compel the Daskeviches' participation in the sale.[21] The broader transaction closed through the final execution of the MIPA later that same day, though the Daskeviches refused to execute the closing documents.[22]

## C. Prior summary-judgment rulings narrowing the dispute

¶ 18. This Court has previously issued two summary-judgment orders that, taken together, narrowly frame the remaining issue before the Court.

¶ 19. On April 10, 2026, the Court ruled that Section 9.2 of the Company Agreement required only "Board Approval," meaning a simple majority vote, for a transfer to invoke the drag-along mechanism. The Court rejected the Daskeviches' contention that the transaction required separate, unanimous "Special Director Approval" under Section 7.2(c)(ii). In that opinion, the Court reserved judgment on whether the transaction qualified as a "Controlling Sale" to a non-affiliate purchaser.

---

[19] *Id.*; Donovan Aff. ¶ 7.
[20] Curry Aff. ¶ 7.
[21] Pl.'s Ex. 12.
[22] Def.'s Ex. G (MIPA).

¶ 20.   In a separate opinion four days later, on April 14, 2026, the Court ruled that the Daskeviches still owned their membership interests in Gage Western because they had declined to execute the closing documents on November 15, 2024. The Court emphasized again the limited scope of that ruling and expressly reserved judgment on whether the drag-along mechanism had been validly triggered in the first instance.

¶ 21.   The parties' cross-motions now bring that sole remaining question to the forefront: Did GW Allen qualify as a non-"Affiliate" purchaser within the meaning of Section 9.2(c)?[23]

## SUMMARY-JUDGMENT STANDARD

¶ 22.   Summary judgment is governed by Texas Rule of Civil Procedure 166a. A movant "bears the burden to show that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law."[24] The nature of that burden varies by posture. A plaintiff must conclusively establish all essential elements of its claim.[25] A defendant must either conclusively negate at least one element of the plaintiff's claim or prove all elements of an affirmative defense.[26]

---

[23] The parties frame the relevant inquiry as whether GW Allen was an Affiliate of EFF. The Court addresses the issue on that basis. The Court notes, however, that a credible argument could be made that the focus should be on PJC, because it was PJC that made the initial offer to acquire Gage Western, sent the letter of intent, and later formed GW Allen as the acquisition vehicle. Regardless, the distinction is not outcome determinative. The summary-judgment record contains no evidence that EFF controlled, was controlled by, or was under common control with PJC at any relevant time. Nor has Daskevich argued otherwise.

[24] *ConocoPhillips Co. v. Koopmann*, 547 S.W.3d 858, 865 (Tex. 2018) (citing TEX. R. CIV. P. 166a(c)).

[25] *See MMP, Ltd. v. Jones*, 710 S.W.2d 59, 60 (Tex. 1986) (per curiam).

[26] *Stanfield v. Neubaum*, 494 S.W.3d 90, 96 (Tex. 2016).

¶ 23. In evaluating whether a fact issue exists, a court takes as true all evidence favorable to the nonmovant, indulges every reasonable inference in the nonmovant's favor, and resolves any doubts against the movant.[27] The court may not weigh the evidence or resolve credibility determinations at this stage; its role is limited to deciding whether a genuine fact issue exists for trial.[28]

¶ 24. Questions of contract interpretation are especially well suited for summary judgment.[29] In construing a contract, the Court's objective is to ascertain and give effect to the parties' intent as expressed in the agreement itself.[30] To do so, the Court considers the contract as a whole, harmonizing and giving effect to all provisions so that none are rendered meaningless.[31]

¶ 25. This analysis begins—and, if possible, ends—with the contract's plain language.[32] If the language is susceptible to a definite or certain legal interpretation, it is unambiguous and must be enforced as written.[33] If, on the other hand, the contract is susceptible to more than one reasonable interpretation, it is

---

[27] *ConocoPhillips*, 547 S.W.3d at 865.

[28] *Huckabee v. Time Warner Ent. Co. L.P.*, 19 S.W.3d 413, 422–23 (Tex. 2000); *see also Ortega v. Pean*, No. 01-18-00249-CV, 2019 WL 1560859, at *10 (Tex. App.—Houston [1st Dist.] Apr. 11, 2019, pet. denied) (mem. op.) ("[I]f a summary judgment motion involves the credibility of affiants, or the weight to be given to evidence, the motion should not be granted." (internal quotation marks omitted)).

[29] *See Hallmark v. Port/Cooper-T. Smith Stevedoring Co.*, 907 S.W.2d 586, 590 (Tex. App.—Corpus Christi-Edinburg 1995, no writ); *Tellepsen Builders, L.P. v. Kendall/Heaton Assocs., Inc.*, 325 S.W.3d 692, 696 (Tex. App.—Houston [1st Dist.] 2010, pet. denied).

[30] *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011); *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003).

[31] *Italian Cowboy*, 341 S.W.3d at 333.

[32] *Id.* (citing *Progressive Cnty Mut. Ins. Co. v. Kelley,* 284 S.W.3d 805, 807 (Tex. 2009) (per curiam)).

[33] *J.M. Davidson*, 128 S.W.3d at 229; *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983).

ambiguous.[34] Only in that circumstance may the court consider extraneous evidence "to determine the true meaning of the instrument."[35]

¶ 26. These principles apply with equal force to limited liability company agreements.[36] Such agreements govern an LLC's internal affairs and may include "any provisions for the regulation and management" of the LLC's affairs that are not inconsistent with law.[37] The Court construes such agreements as a whole and gives their terms their plain, ordinary, and accepted meanings unless the agreement itself indicates a different or technical usage.[38] When the provisions of a company agreement are unambiguous, a court must enforce them as written.[39]

## ANALYSIS

### A.    The "Affiliate" definition requires actual, present control.

¶ 27. The Court's analysis begins and ends with the Company Agreement's plain text. The definition of "Affiliate" turns on "control," which the Agreement defines as "the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies" of the relevant entity, "whether through

---

[34] *Italian Cowboy*, 341 S.W.3d at 333 (citing *J.M. Davidson*, 128 S.W.3d at 229).

[35] *Id.* at 333–34 (quoting *David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 450–51 (Tex. 2008) (per curiam)).

[36] *Bay Area RV Parks, L.L.C. v. WGB RV Parks, LLC*, No. 01-21-00085-CV, 2023 WL 2248738, at *6 (Tex. App.—Houston [1st Dist.] Feb. 28, 2023, pet. denied) (mem. op.) (citing *Abdullatif v. Choudhri*, 561 S.W.3d 590, 609–10 (Tex. App.—Houston [14th Dist.] 2018, pet. denied)).

[37] TEX. BUS. ORGS. CODE § 101.052(a), (d); *Bay Area RV Parks, L.L.C.*, 2023 WL 2248738, at *6.

[38] *See Bay Area RV Parks, L.L.C.*, 2023 WL 2248738, at *6 (citing *URI, Inc. v. Kleberg Cnty.*, 543 S.W.3d 755, 764 (Tex. 2018)).

[39] *See id.*

the ownership of voting securities, partnership interests or other equity interests, or by contract or otherwise." Three distinct features of that definition are dispositive.

¶ 28.  First, the definition is framed entirely in the present tense. An Affiliate is any entity that "controls," "is controlled by," or "is under common control with" the specified person. "Control," in turn, means the present "possession" of the power to direct management and policies. The term "possession" is not an incidental choice of words. It denotes current, existing authority, not a future or contingent entitlement to it.[40] A party negotiating for future rights does not yet possess them, no matter how certain their eventual receipt may seem.

¶ 29.  Second, the definition focuses on actual operational governance, not on who had negotiating leverage during the transaction. Under the Agreement's plain language, "control" means "the power to direct or cause the direction of [an entity's] management and policies"—a standard corporate law concept denoting day-to-day operational command.[41] The relevant inquiry is therefore straightforward: before closing, who could actually run GW Allen? Who had authority to appoint managers, bind the company, or direct daily operations? The

---

[40] *Possession*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("The fact of having or holding property in one's power; the exercise of dominion over property."); *Possession*, MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/possession (last visited May 28, 2026) ("[T]he act or condition of having or taking into control.").

[41] *Darocy v. Abildtrup*, 345 S.W.3d 129, 137 (Tex. App.—Dallas 2011, no pet.) (adopting substantially similar definition of "control" from federal securities law); *see also Control*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("The direct or indirect power to govern the management and policies of a person or entity, whether through ownership of voting securities, by contract, or otherwise; the power or authority to manage, direct, or oversee.").

undisputed answer is PJC—not EFF, which merely negotiated for rights it hoped to receive after closing.

¶ 30. Third, the phrase "by contract *or otherwise*," which Daskevich seizes upon, expands the *methods* by which control may be established, but it does not eliminate the *temporal* requirement that control must presently exist. At a basic level, the Court agrees with Daskevich that this catch-all language prevents parties from hiding affiliate relationships behind clever labels or corporate subterfuge.[42] It rightly captures arrangements that confer actual, operative authority even without majority ownership, such as voting trusts, pooling agreements, or board-control agreements. It does not, however, override the requirement that control must presently reside in the specified person. To hold otherwise would be to read the word "possession" completely out of the definition.

## B. Reading the transaction documents as a whole confirms that GW Allen was controlled by PJC, not EFF.

¶ 31. Daskevich is correct as a matter of law that related transaction documents may be read together to ascertain the parties' intent.[43] The Court has therefore examined the entire transactional record: the LOI, the MIPA, GW Allen's formation documents, the pre-closing drafts, and the A&R Agreement. Read

---

[42] *See* Def.'s Mot. ¶¶ 38–40, 46–52.
[43] *Ft. Wor. Indep. Sch. Dist. v. City of Ft. Wor.*, 22 S.W.3d 831, 840 (Tex. 2000); Def.'s Mot. ¶ 31.

together, these materials confirm that GW Allen was under PJC's exclusive control before closing.

¶ 32. The record at every stage reflects PJC's unbroken ownership and command. From the outset, PJC's LOI proposed that "PJC Investments, LLC, or any of its subsidiaries" would acquire Gage Western[44]—placing the buyer squarely within PJC's organizational family from the beginning. PJC then formed GW Allen as a wholly owned, single-member acquisition vehicle.[45] Curry, PJC's COO, organized the entity and served as its sole manager.[46] Before closing, EFF held no equity in GW Allen, no voting rights, no authority to appoint or remove managers or directors, and no power to bind or direct the entity.[47] PJC, acting through Curry, made every decision concerning GW Allen's formation, capitalization, and deal strategy.[48]

¶ 33. No evidence in the record contradicts this governance structure. Curry testified that PJC exclusively owned and controlled GW Allen before closing, and Donovan's testimony was to the same effect. He confirmed that before closing, EFF did not hold any "right to direct or control GW Allen's management or policies," any "voting rights or governance rights in GW Allen," or any "contractual rights to

---

[44] Pl.'s Ex. 3.
[45] Curry Aff. ¶¶ 2–3.
[46] Pl.'s Exs. 7–9; Curry Aff. ¶¶ 2–3.
[47] Curry Aff. ¶¶ 3–4.
[48] *Id.* ¶ 4.

control GW Allen."[49] Donovan also attested that the negotiations over the A&R Agreement concerned only future post-closing governance rights and "did not grant EFF any present rights to control GW Allen before closing."[50]

¶ 34. Daskevich points to no contrary evidence showing that EFF possessed any actual authority over GW Allen at any time before closing. Instead, his defense relies on a retroactivity theory—arguing that the rights EFF received *at* closing under the A&R Agreement somehow reached back in time to taint the pre-closing entity.[51] This temporal flaw is fatal to his argument.

¶ 35. The pre-closing drafts and emails on which Daskevich relies are entirely consistent with this timeline. They reflect active negotiation—which is what independent parties who lack present rights must do to obtain future ones. For example, EFF initially proposed a three-person board for the post-closing version of GW Allen, including two EFF-designated seats.[52] PJC rejected that proposal, and the parties eventually agreed on a five-member board consisting of two EFF directors, two PJC directors, and a mutually selected fifth.[53] This back-and-forth negotiation is difficult to reconcile with the notion that EFF already controlled GW Allen. If EFF truly possessed the authority to dictate GW Allen's governance before

---

[49] Donovan Aff. ¶ 4.
[50] *Id.* ¶ 6.
[51] *See* Def.'s Resp. to Pl.'s Cross-Mot. ¶¶ 14–19.
[52] *See* Ex. B to Pl.'s Ex. 4 (email negotiations); Ex. D § 7.1 to Pl.'s Ex. 4.
[53] *See* Pl.'s Ex. 13 (executed version of A&R Agreement) § 7.1(a).

closing, PJC's resistance would have been meaningless. The negotiating record therefore does not establish pre-closing control; it confirms that EFF was bargaining for rights it did not yet possess.

**C.      The phrase "in connection with" does not make post-closing rights retroactively operative.**

¶ 36. Daskevich's most textually grounded argument rests on Section 9.2(c)'s phrasing: that drag-along rights apply "*[i]n connection with* the proposed Transfer" of units "to one or more persons who are not Affiliates of the Dragging Member." He argues that this language—"in connection with"—is deliberately expansive and requires the Court to view the transaction as an integrated whole, looking past individual documents to examine the final destination of the deal.[54]

¶ 37.  The Court agrees, up to a point, that the phrase "in connection with" is broad language requiring the transaction to be evaluated as a whole. And the Court has done exactly that. But even viewing the transaction as an integrated whole, Daskevich's argument still fails because the decisive issue is not *which* documents the Court may consider, but *what* type of control those documents require.

¶ 38. Even read broadly, the phrase "in connection with" cannot alter the definitive timeline established by the contract. Section 9.2(c) conditions the drag-along on a "*proposed* Transfer"—a transfer that, by definition, has not yet

---

[54] Def.'s Resp. to Pl.'s Cross-Mot. ¶¶ 2–8.

occurred[55]—to persons "who *are not* Affiliates" of the Dragging Member. These are present-tense concepts evaluated before the transaction closes. The "in connection with" phrase sweeps in related documents for interpretive context, but it does not authorize the Court to declare a pre-closing entity to be an affiliate based on rights that spring into existence only after the transaction is consummated.

¶ 39. The operational sequencing of the drag-along mechanism reinforces this reading. Section 9.2 authorizes a Dragging Member to issue a Drag Along Notice "either before or after a Notice of Proposed Transfer." Both notices are *pre*-closing mechanisms designed to assemble the company's equity in preparation for a future sale. In ordinary commercial practice, those notices are delivered weeks before closing.[56] If the validity of those notices turned on post-closing governance documents, the legal status of an already-issued notice could not be verified until after closing. This would make the drag-along mechanism commercially unworkable and would leave transactions in an extended state of limbo.

¶ 40. The Court therefore rejects Daskevich's retroactivity theory. The A&R Agreement can indeed be read alongside the other transaction documents, but it cannot be used to shift post-closing governance rights backward in time. If the drafters of the Company Agreement had intended to bar drag-along transactions

---

[55] *Proposed*, THE COMPACT OXFORD ENGLISH DICTIONARY (2d ed. 1991) ("Put forward for consideration or adoption . . . .").

[56] *See Primexx Energy Opportunity Fund, LP v. Primexx Energy Corp.*, 2025 Tex. Bus. 9, ¶ 180, 709 S.W.3d 619, 655 (1st Div.) ("[A]dvance notice requirements are common with drag-along rights.").

where a seller rolls over equity or retains post-closing board seats, they could easily have written a forward-looking restriction. They chose not to do so.[57]

## D. The chronological record does not establish pre-closing control.

¶ 41. Daskevich places particular emphasis on one chronological detail. He points to John Donovan's August 17, 2024 written consent approving a drag-along transfer to "GW Allen, LLC,"[58] even though GW Allen did not legally exist until September 3, 2024. Daskevich argues this chronology reveals an insider-constructed transaction in which EFF was controlling the buyer before the buyer existed.[59]

¶ 42. The Court acknowledges that this sequence is unusual, but it does not establish control under the Agreement's definition. When Donovan signed the August 17 consent, GW Allen did not yet exist as a legal entity. As a matter of basic logic, then, EFF could not have exercised governance authority over GW Allen at that point because there was no entity to govern. And once GW Allen was organized in September 2024, the undisputed evidence shows that PJC owned it entirely and Curry managed it exclusively.[60] Accordingly, while the pre-formation activity

---

[57] *See Waste Mgmt. of Tex., Inc. v. Stevenson*, 622 S.W.3d 273, 286 (Tex. 2021) (explaining that Texas's strong public policy favoring parties' freedom of contract permits parties to "bargain for mutually agreeable terms and allocate risks as they see fit"); *U.S. Denro Steels, Inc. v. Lieck*, 342 S.W.3d 677, 682 (Tex. App.— Houston [14th Dist.] 2011, pet. denied) (enforcing "what is written in the contract, not . . . what one side contends they intended but failed to say").

[58] Pl.'s Ex. 6.

[59] Def.'s Mot. ¶¶ 49–50.

[60] Pl.'s Exs. 7–9; Curry Aff. ¶¶ 2–4.

almost certainly reflects advance planning and coordination between the parties, it does not demonstrate the exercise of present operational control over an existing entity.

¶ 43. Moreover, the broader problem with Daskevich's chronology argument is that it proves too much. In virtually every corporate acquisition involving a newly formed special-purpose acquisition vehicle, the target entity does not exist at the time the seller and acquiror first begin coordinating. The seller often knows who will own the buyer, what governance rights the seller may receive post-closing, and how the acquisition vehicle will be capitalized, all before the vehicle is formed. None of that transactional awareness constitutes "control" of the entity. The alternative interpretation would cast doubt on virtually any drag-along transaction involving a newly formed acquisition vehicle, a disruptive result the parties plainly did not intend and that the Agreement's text does not support.

## E. Daskevich's interpretation would produce commercially unreasonable results.

¶ 44. The Court's textual analysis is sufficient to resolve this dispute. But even if Daskevich's interpretation were textually plausible, Texas law counsels against contract interpretations that produce commercially unreasonable results, absent clear contractual language requiring that outcome.[61]

---

[61] *See FPL Energy, LLC, v. TXU Portfolio Mgmt. Co., L.P.*, 426 S.W.3d, 59 63 (Tex. 2014) ("[W]e construe contracts from a utilitarian standpoint bearing in mind the particular business activity sought to be served.");

¶ 45. Daskevich's interpretation would produce exactly that kind of untenable result. Rollover equity and post-closing board participation are common, ubiquitous features of modern merger and acquisition transactions.[62] Sellers frequently retain minority equity interests, board-designation rights, veto protections, or other governance participation in the acquiring entity as part of the transaction consideration. Under Daskevich's theory, however, the mere negotiation of such post-closing rights would transform an otherwise independent buyer into an "Affiliate" during the drafting phase, nullifying the drag-along rights the parties expressly bargained for in the Company Agreement.

¶ 46. Moreover, if "Affiliate" status could be decided based on post-closing rights, Daskevich's theory provides no principled stopping point. The theory would apply equally to a seller who merely accepts passive rollover equity as consideration and to a seller who negotiates more substantial future governance protections. Although the former is plainly routine, Daskevich offers no workable standard for determining when future contingent rights become sufficient to establish present "control." Courts would be left to draw inherently subjective lines regarding how

*The Mark at Weatherford Owner, LLC, v. German*, 2026 Tex. Bus. 22, ¶ 34, 2026 WL 1266173, at *6 (8th Div.) (mem. op.).

[62] *See, e.g.*, Casey S. August & Paul A. Gordon, *Know Your 'Roll'—Planning for Taxable Acquisitions of S Corporations Involving Equity Rollover for Sellers*, 18 No. 4 BUS. ENTITIES 4, 4 (2016) (explaining that rollover equity is prevalent in acquisitions of S corporations); *Wachovia Capital Partners, LLC v. Frank Harvey Inv. Family Ltd. P'ship*, No. 05-CVS 20568, 2007 WL 2570838, at *8 (N.C. Super. Mar. 5, 2007) (describing rollover provisions as "perfectly normal" in merger transactions).

much anticipated future influence is too much. The Company Agreement supplies no objective benchmark for making that determination because its Affiliate definition is framed strictly around existing control relationships, not contingent future rights that arise only after closing.

## CONCLUSION

¶ 47. The Court's ruling follows directly from the plain language of the Company Agreement. The Agreement defines Affiliate status strictly by reference to existing control relationships. Its text is written in present tense, its definition requires actual "possession" of governance power, and its drag-along mechanics apply to a "proposed transfer" before closing. Nothing in the Agreement allows post-closing governance rights to retroactively create affiliate status.

¶ 48. The undisputed evidence shows that, before closing, GW Allen was owned and controlled exclusively by PJC. EFF held no equity interest, no voting authority, no managerial power, and no contractual right to direct GW Allen's affairs. Although EFF negotiated for substantial post-closing rights, it did not possess those rights until the transaction closed.

¶ 49. IT IS THEREFORE ORDERED that Philip Daskevich's motion for partial summary judgment is **DENIED** and EFF's cross-motion is **GRANTED**.

¶ 50. IT IS FURTHER DECLARED that:

1.   GW Allen, LLC was not an "Affiliate" of Energy Founders Fund, LP within the meaning of the Third Amended and Restated Limited Liability Company Agreement of Gage Western LLC in connection with the November 15, 2024 transaction; and

2.   the transfer of units to GW Allen, LLC pursuant to the November 15, 2024 transaction did not violate Section 9.2(c) of the Company Agreement.

IT IS SO ORDERED.

_____
BRIAN STAGNER
Judge of the Texas Business Court,
Eleventh Division, sitting by
assignment

SIGNED: May 29, 2026